William A. Richards #013381
Natalya Ter-Grigoryan #029493
**RICHARDS & MOSKOWITZ PLC**
1850 North Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone No. 602-595-7800
Facsimile No. 602-595-7800
E-mail: brichards@RMazlaw.com
        gideon@RMazlaw.com

Andrew Rozynski (Pro Hac Vice to be Filed)
**EISENBERG & BAUM, LLP**
24 Union Square East, Penthouse
New York, NY 10003
Telephone No. 212-353-8700
Facsimile No. 212-353-1708
E-mail: arozynski@EandBLaw.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ivanito Tauscher and Mark Tauscher, a married couple; Maria Del Carmen Hamblin, an individual, | Case No. |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| City of Glendale, a municipality; Glendale Police Department Officer William Newport, #16461, an individual; Glendale Police Department Officer Alessandro Cozzolino, #18700, an individual; Glendale Police Department Officer Kevin Kellogg, #9499, an individual; Doe Defendants 1-10, | |
| Defendants. | |

Plaintiffs Ivanito Tauscher, Mark Tauscher, and Maria Del Carmen Hamblin allege:

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

**THE ACTION**

1.      This is a civil action under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), and 42 U.S.C. § 1983. Plaintiffs seek full relief and compensation for all past, present, and future losses and harms caused to them by any of the Defendants' actions and omissions alleged in this Complaint, including those: 1) undertaken by any of the Defendants under color of law with the intent and for the purpose of depriving Plaintiffs of any right secured by the Constitution or the laws of the United States; and/or 2) that involve any of the Defendants refusing or neglecting to prevent the rights deprivations and denials asserted in this Complaint.

2.      The City of Glendale (the "City") is sued as a result of the actions or omissions of its agents, including Glendale Police Department ("GPD") Officers William Newport, Alessandro Cozzolino, and Kevin Kellogg, as alleged herein, all of which occurred within the scope of each such agent's authority and work for the City, and all of which were either caused or ratified by the City.

3.      The City is sued due to the Glendale City Jail's (the "Jail") lack of accommodations and access to disabled individuals within the meaning of the ADA, and the actions or omissions of its agents, including Jail personnel, as alleged herein, all of which occurred within the scope of each such agent's authority and employment, and all of which were either caused or ratified by the City.

4.      The City is sued as a result of Glendale City Court's (the "Court") lack of accommodations for disabled individuals within the meaning of the ADA, and for acts and omissions of its agents, including Court personnel, as alleged herein, all of which occurred within the scope of each such agent's authority and employment, and all of which were either caused or ratified by the City.

5.      GPD Officers learned that Ivanito and Maria are Deaf immediately upon arriving at the residence on Belmont Avenue in Glendale, Arizona, on March 16, 2021. On information and belief, based on the call notes relating to the dispatch, the Officers were aware even prior to arriving at the residence that Ivanito was Deaf. Although Ivanito and

2

Maria attempted to call 9-1-1, their calls were delayed because they were needed an American Sign Language ("ASL") interpreter to communicate with the 9-1-1 dispatcher. As a result, the information provided to the officers was that "a younger male [was] assaulting older people," and that "the landlord of the house was being beaten by a Deaf man." Despite being aware of Ivanito and Maria's disability, the dispatched Officers, including Officers Newton and Cozzolino, made no effort to interview Ivanito and Maria through an ASL interpreter as part of their investigation. Defendants deprived Ivanito and Maria of the ability to effectively communicate during the investigation, arrest, and subsequent court proceedings by denying Plaintiffs' requests for an ASL interpreter, in violation of anti-discrimination statutes and Plaintiffs' rights. Defendants also deprived Mark, who is also Deaf, of the ability to access the Jail and communicate with Jail personnel due to his disability, and further deprived Mark of the ability to fully participate in and understand the criminal arraignment hearing relating to Ivanito due to the Court's failure to procure an ASL interpreter, as requested by Mark and Ivanito.

**PARTIES, JURISDICTION, AND VENUE**

6.      Ivanito is, and at all times relevant to this Complaint has been, an individual residing in Maricopa County, Arizona. Ivanito is profoundly Deaf and communicates in ASL. He is substantially limited in the major life activities of hearing and speaking, and qualifies as a disabled person within the meaning of the ADA and the RA. Ivanito needed, requested, and was denied a reasonable accommodation for his disability to facilitate effective communication between himself and Defendants during the investigation, detention, arrest, reading of *Miranda* warnings, interrogation, and court proceeding, all of which occurred in or around March 2021.

7.      Maria is, and at all times relevant to this Complaint has been, an individual residing in Maricopa County, Arizona. Maria is profoundly Deaf and communicates in ASL. She is substantially limited in the major life activities of hearing and speaking, and qualifies as a disabled person within the meaning of the ADA and the RA. Maria needed and was denied a reasonable accommodation for her disability to facilitate effective communication

between herself and GPD Officers during their investigation on or about March 16, 2021.

8.      Mark is, and at all times relevant to this Complaint has been, an individual residing in Maricopa County, Arizona. Mark is profoundly Deaf and communicates in ASL. He is substantially limited in the major life activities of hearing and speaking, and qualifies as a disabled person within the meaning of the ADA and the RA. Mark was denied equal access to the Jail due to his disability, and needed, requested, and was denied a reasonable accommodation for his disability during a public court proceeding pertaining to Ivanito, all of which occurred in or around March 2021.

9.      The City is a municipality, organized and operating pursuant to the laws of the State of Arizona. The City is a governmental entity and acted through its agents at all times relevant to the claims in this Complaint. On information and belief, the agents of the City whose actions and omissions form the basis for Plaintiffs' claims were acting at all material times with the City's consent and authorization, and according to the City's training, customs, policies, or practices. On information and belief, the City is a recipient of federal financial assistance subject to the requirements of the RA.

10.     The GPD, the Jail, and the Court is each a department or subdivision of the City, which operates through its employees. The City has authority to direct the policies and customs implemented by the employees within its departments or subdivisions, and therefore is liable for the acts and omissions of the agents of the GPD, the Jail, and the Court, including the acts and omissions that form the basis of Plaintiffs' claims.

11.     Officer Newport, Badge #16461, was employed as an officer of the GPD on or about March 16, 2021, and at all times relevant to this Complaint. On information and belief, Officer Newport is, and at all times relevant to this Complaint has been, a resident of Arizona.

12.     Officer Cozzolino, Badge #18700, was employed as an officer of the GPD on or about March 16, 2021, and at all times relevant to this Complaint. On information and belief, Officer Cozzolino is, and at all times relevant to this Complaint has been, a resident

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

of Arizona.

13.    Officer Kellogg, Badge #9499, was employed as an officer of the GPD on or about March 16, 2021, and at all times relevant to this Complaint. On information and belief, Officer Kellogg is, and at all times relevant to this Complaint has been, a resident of Arizona.

14.    Doe Defendants 1-10 are individuals, corporations, limited liability companies, and other entities (collectively, the "Fictitiously-Named Defendants"), whose true names and identities are not known to Plaintiffs, and who are liable, jointly and severally with the named Defendants, for the transactions, agreements, acts, and omissions alleged in this Complaint, as joint tortfeasors, co-conspirators, alter egos, or otherwise. Plaintiffs reserve the right to amend this Complaint to identify any of the Fictitiously-Named Defendants whose identity becomes known to them.

15.    Jurisdiction and venue are proper in this Court.

16.    Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has subject matter jurisdiction with respect to claims arising under Section 504 of the RA, 29 U.S.C. § 794, and Title II of the ADA. 42 U.S.C. §§ 12181, *et seq*.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the acts and omissions giving rise to the alleged causes of action occurred in this District.

## GENERAL ALLEGATIONS

*When GPD Officers responded to the 9-1-1 call on March 16, 2021, it was immediately apparent Plaintiffs required an ASL interpreter to communicate. Despite the obvious need and multiple requests, GPD Officers failed to procure an ASL interpreter or make any effective communication aid available to Ivanito or Maria.*

18.    Plaintiffs reallege all other allegations in this Complaint.

19.    Ivanito and his elderly mother, Maria, are Deaf individuals who communicate through ASL. As a result of their disability, Plaintiffs were unable to communicate with Defendants during the critical times alleged herein without an ASL interpreter or any communication aid.

20.    In 2020, Wayne Baron agreed to allow Maria and her husband, Richard

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

Hamblin ("Richard"), to live with him in his home in Glendale, Arizona. The three planned to live together, however in November 2020, without any notice to Maria or Richard, Mr. Baron allowed his sister, Dawn Baron-King, to move in. Dawn was immediately hostile toward Maria, who is an elderly woman in her 70s, and went out of her way to make Maria uncomfortable to prompt her to leave. In December 2020, Mr. Baron's fiancé, Beverly Campbell, also moved into the house, which again came as a surprise to the Hamblins. The living arrangement became both cramped and increasingly hostile.

21.     Maria and Richard decided to move out, and were in the process of doing so on March 16, 2021. Due to their age and limited physical capabilities, Ivanito was present to help load their items into the car. An altercation ensued after Beverly accused Maria of stealing a plastic bin, and began opening Maria's boxes. Ivanito stood between Beverly and his mother's belongings while Maria video called Richard to let him know what was happening. Beverly pushed Ivanito, and as Maria approached her son to show her husband what was happening via FaceTime, Beverly pushed Maria. At the same time, Wayne hit Maria's arm, trying to knock the phone out of her hand. Maria fell hard to the floor, and remained there until police officers arrived. After Beverly pushed Maria, Ivanito placed himself between Maria and Beverly to protect his elderly mother from being assaulted further while she was on the ground. Beverly refused to retreat, and the altercation continued between Ivanito, Beverly, and Wayne. During this altercation, Beverly fell, knocking over Wayne, who was standing behind her, in the process.

22.     During the dispute, Maria called 9-1-1 at approximately 2:19 p.m. Ivanito used Maria's phone to call 9-1-1 at approximately 2:24 p.m. Because both Ivanito and Maria are Deaf, the 9-1-1 calls were delayed due to their need to use an interpreter to place the calls and report what was happening. As a result, on information and belief, the GPD received the 9-1-1 call placed by Beverly or Dawn first.

23.     Prior to GPD's arrival, on information and belief, Dawn instructed Beverly to lie on the floor and act like she was injured. Dawn was also the one who eventually greeted

6

the arriving GPD Officers and ushered them into the house, letting them know that Beverly was injured and that Maria, "the lady on the floor right here, is a drama queen." In actuality, Beverly fell in the vicinity of the where Maria was located, not on the other side of the room, where Beverly is featured in the body camera footage.

24.     Having heard (and apparently accepted at face value) the versions of events provided by the hearing individuals only (Dawn, Beverly, and Wayne), GPD did not complete a thorough investigation after arriving at the residence. They did not make any meaningful inquiry into Maria's or Ivanito's conditions, and did not take any photographs of their injuries.

25.     Maria sustained bruises on her arm and buttocks as a result of being pushed to the ground. She did not have an opportunity to explain to the officers what had happened because GPD did not secure an ASL interpreter. The body camera footage confirms GPD Officers had limited interactions with her. GPD made no effort to ascertain what happened to Maria, who was not identified as a victim in the police report despite being assaulted by Beverly and suffering physical injuries. GPD officers only minimally engaged with Maria's daughter in-law, April Maldonado (who is not Deaf, but communicates in ASL) regarding whether Maria required immediate medical attention.

26.     Ivanito sustained multiple injuries to his back, head, arm, and leg, none of which were documented until he sought medical care the following day. GPD did not learn of these injuries because they made no effort to interview Ivanito with the aid of an ASL interpreter, despite being aware he was Deaf and used ASL to communicate.

27.     GPD Officers were immediately aware of Plaintiffs' inability to communicate due to their disabilities. GPD Officers made no effort to interview Plaintiffs with the aid of an ASL interpreter, despite being aware of their impairment and reliance on sign language to communicate. GPD Officers interviewed the hearing individuals at length while declining to provide any accommodations to ensure effective communication with Plaintiffs. As a result, Plaintiffs were denied an equal opportunity to communicate their version of events,

which contradicted the false narrative of the hearing individuals. Plaintiffs also were deprived of an equal opportunity to understand their rights, to be recognized as victims, and to have those who assaulted them held accountable.

28.     On information and belief, by the time GPD Officers encountered Plaintiffs, they had already concluded Ivanito was the aggressor. Their interviews with the purported victims, who were not disadvantaged by any disability that impaired their ability to communicate, created the officers' premature – and erroneous – conclusion. Wayne even admitted Beverly was the aggressor when he informed police that Ivanito "shoved her *back*," or used words to that effect, confirming that Ivanito was defending himself and his mother against Beverly's physical assault.

29.     When Ivanito, while handcuffed, repeatedly gestured for a writing instrument and something to write on in a feeble attempt to have access to some communication aid, the GPD officer who handcuffed him nodded and told him more than once that he would get him a piece of paper, but never followed through, ignoring even this simple request.

30.     After GPD Officers finished interviewing the hearing individuals, Officer Newport opened the door to the back seat of a police car, where Ivanito remained handcuffed. Officer Newport proceeded to talk at him, asking him about taking his car keys while giving him a "thumbs up." Ivanito attempted to mouth a response and is seen struggling to use his handcuffed hands to communicate. Ivanito shifted to the side and gestured a writing motion with his bound hands. Officer Newport abruptly shut the door and told the other three officers, "Well I don't know if he said yes or no," and proceeded to laugh about Ivanito's inability to communicate. A female officer is then seen asking Ivanito about the car keys before becoming exasperated and asking, "You can't read my lips?"

31.     The resulting police report documents exclusively what GPD heard from Wayne, Dawn, and Beverly. The notes in the police report reflect "the landlord of the house was beaten by a Deaf man." Ivanito is similarly categorized in other parts of the report, which serves no conceivable purpose when he could have been identified by name, or

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

8

described as the tenant's adult son. The gratuitous references to Ivanito's disability indicate discriminatory views that explain GPD's disparate treatment of the hearing and Deaf individuals involved in the March 16, 2021 incident. The description also establishes that GPD failed to procure an ASL interpreter or any communication aid despite being fully aware that Plaintiffs were Deaf.

*Ivanito was arrested and transported to the Jail, where he was provided Miranda warnings and interrogated without the benefit of an ASL interpreter.*

32.    GPD Officers arrested Ivanito without providing him an ability to communicate, and transported him to the Jail. While at the Jail, Ivanito continued to encounter discrimination.

33.    Shortly before GPD Officers transported Ivanito to the Jail, Mark arrived at the Glendale residence and, using a text messaging app, reiterated that Ivanito needed an ASL interpreter to communicate.

34.    The City, through its employees or agents, never provided Ivanito a qualified ASL interpreter or made any type of accommodation available to him at any time throughout their interactions.

35.    The City, through its employees or agents, failed to ensure effective communication with Ivanito during critical arrest and post-arrest proceedings.

36.    Both before and after transporting Ivanito to the Jail, GPD Officers were notified that Ivanito needed an ASL interpreter to communicate.

37.    After transporting Ivanito to the Jail, GPD Officers knowingly and willfully continued to engage in discriminatory conduct. GPD Officers proceeded to give Ivanito *Miranda* warnings and attempted to interrogate him — all without procuring an ASL interpreter. Ivanito was deprived of any information about his arrest, including why he is in custody, how long he would remain in custody, and when he would appear in Court.

38.    After GPD Officers transported Ivanito to the Jail, Mark went to the Jail to obtain additional information regarding Ivanito's arrest. Mark was unable to access the Jail

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

because the only available means of alerting the Jail personnel of his presence was an intercom device designed exclusively for hearing individuals.

39.     Mark was unable to access the Jail and had to wait until two individuals working at the Records Tech Desk sent two female personnel to speak with him. At that point, Mark was able to explain by showing them text messages that he was Ivanito's husband, and that he was unable to call the Jail personnel because the available communication devices were "not accessible for me." Once he was escorted inside the Jail, Mark reiterated to every employee of the Jail he encountered that he wanted "to be sure he [Ivanito] has an interpreter." Despite repeated requests for an ASL interpreter, the GPD Officers and the Jail personnel continued to deprive Ivanito of effective communication.

40.     Mark was again unable to access the Jail later that evening, when he returned to deliver Ivanito's prescription medication.

41.     The City, through its employees or agents, caused Ivanito to endure the isolation and humiliation by depriving him of the ability to communicate, which compounded the fear of not knowing what was happening or what was going to happen next.

42.     The City also caused Mark to endure isolation and discrimination by depriving him of equal access to the Jail.

*The City discriminated against Ivanito and Mark by failing to procure an ASL interpreter at Ivanito's arraignment, in violation of their rights.*

43.     After enduring a long and restless night incarcerated in the Jail, Ivanito was transported to the Court for his initial arraignment on assault charges that were the byproduct of GPD Officers' discriminatory and deficient investigation. The assault charged were subsequently dismissed in their entirety.

44.     Mark traveled to the Court to attend Ivanito's arraignment hearing.

45.     Upon arriving at the Court, Mark used a texting application to ask a security guard and the Court clerk if there would be a sign language interpreter. Mark was escorted to the courtroom by the security guard and assured that an ASL interpreter would be present.

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

10

Once Prior to the start of the hearing, when no interpreter had appeared, Mark approached the Court clerk again and reiterated that Ivanito needed to have a sign language interpreter. Mark also alerted the City's victim assistance caseworker, Dulce Zazueta, as well as an attorney present in the courtroom that Ivanito needed an ASL interpreter. Mark observed the attorney, Ericka Nielsen, speaking with the Judge, but could not decipher the substance of their conversation due to his disability. Mark's pleas were ignored, and the arraignment hearing proceeded without an interpreter present.

46.     Even though the GPD knew Ivanito required an ASL interpreter, on information and belief, the GPD failed to make any reasonable efforts to apprise the Court to secure an ASL interpreter to ensure Ivanito was afforded the same right to due process as every hearing individual appearing before the Court.

47.     The Court displayed a placard indicating the types of accommodations available during Court proceedings. At the outset of his arraignment hearing, in an attempt to alert the Court that he required an accommodation, Ivanito picked up the placard and showed it to the Judge. The Judge acknowledged Ivanito's gesture, but proceeded with the arraignment without securing an ASL interpreter.

48.     The Glendale Court Language Access Plan ("GCLAP"), at page 2, acknowledges that "court interpreters are provided for persons with hearing loss" while "access services for [Deaf or hearing-impaired individuals] are covered under the Americans with Disabilities Act rather than Title VI of the Civil Rights Act, and therefore will not be addressed in this plan." The GCLAP, at page 2, further provides: "The need for a court interpreter may be identified prior to a court proceeding by the LEP person or on the LEP persons' behalf by the … police."

49.     Despite the Court's obligation to provide an ASL interpreter to allow Ivanito to communicate during his initial criminal court proceeding, no ASL interpreter was present during Ivanito's arraignment.

50.     Ivanito's arraignment went forward without an ASL interpreter. The Court did

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

not provide Ivanito with the option of waiting for an ASL interpreter or proceeding without one, in derogation of his constitutionally-protected rights. As a result, Ivanito was deprived of the opportunity to be heard, to understand the information provided to similarly-situated hearing individuals, and to fully participate in the arraignment.

51.     Additionally, Mark was unable to exercise his right to fully participate in the hearing as a member of the public. Mark attended the hearing but was unable to understand what was happening due to the Court's failure to make an ASL interpreter or other communication aid available.

52.     Defendants knew or should have known that their actions and/or inactions created an unreasonable risk of causing Ivanito and Mark greater levels of fear, anxiety, indignity, humiliation, and/or emotional distress than a hearing person would be expected to experience.

53.     As a result of Defendants' failure to facilitate effective communication with Plaintiffs, they received services that were objectively substandard and inferior to those provided to hearing individuals. Thus, Plaintiffs were subjected to discriminatory treatment because of their disability.

54.     The City knew of its obligation to train its officers to secure ASL interpreters during critical interactions with suspects and arrestees, such as during arrests and post-arrest procedures, and its failure to train its officers in the importance of utilizing ASL interpreters evidences the City's deliberate indifference to the well-established constitutional rights of Deaf citizens—including the right to be free from unreasonable searches and seizures, to equal protection under the law, and to due process—as well as its deliberate indifference to ensuring officers' and the Courts' compliance with the ADA, the RA, and the Fourth and Fourteenth Amendments.

55.     The City knew of its obligation to ensure disabled individuals were able to access its facilities to the same extent as non-disabled individuals. Thus, the City was aware of its obligation to ensure the Jail was equally accessible to hearing and Deaf individuals.

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

The City's failure to ensure the Jail was accessible to Deaf individuals evidences its deliberate indifference to the well-established rights of Deaf citizens, as well as its deliberate indifference to ensuring the Jail's compliance with the ADA and the RA.

56.    The City demonstrated through its agents' interactions with Plaintiffs that GPD Officers are not properly trained on how to interact with Deaf individuals, and that this failure results in significant communication breakdowns.

57.    The Jail maintained by the City is not equally accessible by Deaf individuals, which results in impaired access, substandard services, and discriminatory treatment.

58.    Defendants' wrongful and intentional discrimination against Plaintiffs on the basis of their disability is the byproduct of the City's failure to train its employees and agents, and its failure to require adherence to GPD's and the Court's policies or lack of policies, designed to prevent discrimination against Deaf individuals.

## COUNT I

### Violation of the ADA – Against the City

59.    Plaintiffs reallege all other allegations in this Complaint.

60.    At all times relevant to this action, Title II of the ADA, 42 U.S.C. §§ 12131 *et seq.*, has been in full force and effect and has applied to Defendants' conduct.

61.    At all times relevant to this action, the United States Department of Justice regulations implementing Title II of the ADA, 28 C.F.R. Part 35, have been in full force and effect and have applied to the Defendants' conduct.

62.    At all times relevant to this action, Plaintiffs have been substantially limited in the major life activities of hearing, and are considered individuals with a disability as defined in the ADA, 42 U.S.C. § 12102(2).

63.    Defendants are public entities as defined under Title II of the ADA, 42 U.S.C. § 12131(1).

64.    Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

65.     Federal Regulations implementing Title II of the ADA state that a public entity may not "(i) deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; [or] (iii) provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others."  28 C.F.R. § 35.130(b)(1).

66.     Federal Regulations implementing Title II of the ADA state that "no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied benefits of the services, programs, or activities of a public entity, or be subjected to a discrimination by any public entity." 28 C.F.R. § 35.149.

67.     Federal Regulations implementing Title II of the ADA state that a public entity "shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from the participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R. § 35.152(b)(1).

68.     Federal Regulations implementing Title II of the ADA state that a public entity "shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1).

69.     Federal Regulations implementing Title II of the ADA state that a public entity "shall furnish appropriate auxiliary aids and services where necessary," and "in order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely

manner, and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 35.160(b).

70.     Title II of the ADA states that auxiliary aids and services include, but are not limited to, "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments." 42 U.S.C. § 12103.

71.     Federal Regulations implementing Title II of the ADA provide examples of other effective methods of accommodation, such as qualified interpreters on-site or through video remote interpreting (VRI) services; real-time computer-aided transcription services; written materials; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; and videotext displays. 28 C.F.R. § 35.104.

72.     When determining what type of auxiliary aid and service is necessary, "a public entity shall give primary consideration to the requests" of the individual with the disability.  28 C.F.R. § 35.160(b)(2).

73.     Federal Regulations implementing Title II of the ADA state that a public entity "shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication" except in an emergency or when the individual with a disability specifically requests the accompanying adult to interpret. 28 C.F.R. § 35.160(c).

74.     Where a federal entity communicates by telephone with applicants and beneficiaries, "text telephones (TTYs) or equally effective telecommunications systems shall be used to communicate with individuals who are Deaf or hard of hearing or have speech impairments." 28 C.F.R. § 35.161(a).

75.     Based on all of the foregoing allegations confirming Defendants' treatment and interactions with Plaintiffs, Defendants discriminated against Plaintiffs on the basis of their disabilities and violated the ADA by, among other things: 1) excluding them from participation in and denying them the benefits of their services, and by subjecting them to discrimination; 2) failing to ensure effective communication through the provision of a

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

qualified in-person interpreter; 3) forcing a companion to provide in-person interpretive services for Maria; and 4) failing to ensure facilities such as the Jail were equally accessible to Deaf individuals.

76.      Defendants' failure to provide effective communication to Plaintiffs denied them the same access to Defendants' services, benefits, activities, programs, or privileges as the access provided to hearing individuals.

77.      Defendants further discriminated against Plaintiffs by failing to train their employees to accommodate disabled individuals and failing to modify discriminatory practices and procedures, as required by the ADA.

78.      Defendants' violation of Plaintiffs' rights under the ADA caused them to suffer from discrimination, unequal treatment, and exclusion.

79.      Further, Title II of the ADA incorporates the remedies set forth in 29 U.S.C. § 794a of the RA. 42 U.S.C. § 12133.

80.      In turn, 29 U.S.C. § 794a(a)(2) provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."

81.      Accordingly, 29 U.S.C. § 794a(a)(2) provides that anyone bringing claims of discrimination against a recipient of federal funding may avail themselves of the remedies in 42 U.S.C. § 2000e-5(e)(3), which in turn states: "*In addition to* any relief authorized by section 1981a of this title … an aggrieved person may obtain [other] relief …." 42 U.S.C. § 2000e-5(e)(3)(B) (emphasis added). And 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

82.      As such, "*any person* aggrieved by *any act or failure to act by any recipient of Federal Assistance . . . under section 794*" is entitled to the "*remedies*, procedures, and

rights" not only in "title VI of the Civil Rights Act of 1964," but also in "subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5)." 29 U.S.C. § 794a(a)(2) (emphasis added).

83.    42 U.S.C. § 2000e-5(e)(3), in turn, authorizes certain relief "[i]n addition to any relief authorized by section 1981a," and 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

84.    Plaintiffs are also entitled to other forms of compensatory damages beyond damages for emotional distress because Defendants are subject to remedies traditionally available in suits for breach of contract. "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." Rest. (Second) of Contracts § 347 cmt. A (Am. L. Inst. 1981). Here, when citizens like Plaintiffs interact with public entities like Defendants, they expect that they will be able to communicate with the public officials throughout the interactions.

85.    Accordingly, Ivanito had an expectation interest in the ability to fully participate in his own criminal proceedings, such as the investigation, arrest, booking, detainment, arraignment, release, court proceedings, and probation. Defendants denied Ivanito this expectation interest by denying him the opportunity to be informed about and participate in his criminal proceeding. Accordingly, Ivanito should be entitled to compensatory damages based on his expectation interest.

86.    Mark had an expectation interest in the ability to participate in Ivanito's arraignment hearing to the same extent as any hearing member of the public. Defendants denied Mark this expectation interest by denying him the opportunity to be informed about and participate in Ivanito's criminal proceeding. Accordingly, Mark should be entitled to compensatory damages based on his expectation interest.

87.    Maria had an expectation interest in the ability to fully participate in a criminal investigation arising out of the altercation in which she was attacked. Defendants denied her

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

this expectation interest by denying her the opportunity to be informed about and participate in the investigation. Accordingly, Maria should be entitled to compensatory damages based on her expectation interest.

88.     Plaintiffs are also entitled to damages for dignitary harm. *See Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008) (concluding that a "past injury" includes a defendant's "discriminatory failure to ensure effective communication"). "There is no doubt that dignitary harm is cognizable; stigmatic injury is 'one of the most serious consequences' of discrimination." *Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 833–34 (7th Cir. 2019) (quoting *Allen v. Wright*, 468 U.S. 737, 755 (1984)). "A plaintiff personally denied equal treatment by the challenged discriminatory conduct has suffered a concrete injury …." *Id.* at 834 (cleaned up). Thus, Plaintiffs should be entitled to damages for dignitary harm. *See Shaver v. Indep. Stave Co.*, 350 F.3d 716, 724 (8th Cir. 2003) ("[T]he mere fact of discrimination offends the dignitary interest that [civil rights laws are] designed to protect, regardless of whether the discrimination worked any direct economic harm to the plaintiffs.").

89.     The City, through the GPD, further discriminated against Plaintiffs by failing to train its officers to accommodate disabled individuals, and failing to modify discriminatory practices and procedures, as required by the ADA.

90.     Defendants further discriminated against Mark by failing to ensure the Jail facilities were conducive to access by a Deaf individual, and by failing to secure an ASL interpreter for Ivanito's arraignment hearing.

91.     Defendants' violations of Plaintiffs' rights under the ADA caused them to suffer from discrimination, unequal treatment, and exclusion.

92.     As set out above, absent injunctive relief there is a clear risk that Defendants' actions will recur with Plaintiffs and/or other Deaf individuals.

93.     Plaintiffs are therefore entitled to injunctive relief, as well as compensatory damages for the injuries and loss sustained as a result of Defendants' deliberate indifference of their rights under the ADA, as well as an award of attorneys' fees, costs, and

1   disbursements, pursuant to the ADA. *See* 42 U.S.C. § 12133.

## COUNT II

### Violation of the RA – Against the City

94.     Plaintiffs reallege all other allegations in this Complaint.

95.     At all times relevant to this action, Section 504 of the RA, 29 U.S.C. § 794, was in full force and effect, and applied to Defendants' conduct.

96.     At all times relevant to this action, Plaintiffs have had substantial impairment to the major life activities of hearing and speaking within the meaning of 45 C.F.R. § 84.3(j), and therefore qualify as individuals with a disability as defined in 29 U.S.C. § 708(20)(B).

97.     Pursuant to Section 504 of the RA, "no otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

98.     As set forth in the foregoing allegations about Plaintiffs' treatment by and interactions with Defendants, Defendants discriminated against Plaintiffs solely on the basis of their disabilities by denying them meaningful access to the services, programs, and benefits the City offers to other individuals, and by refusing to provide auxiliary aids and services necessary to ensure effective communication, in violation of Section 504 of the RA. 29 U.S.C. § 794.

99.     As set forth in the foregoing allegations about Plaintiffs' treatment by and interactions with Defendants, Defendants further discriminated against Plaintiffs by, among other things: 1) failing to ensure adequate and effective communication with Plaintiffs through the specific provision of a qualified, in-person sign language interpreter; 2) requiring Plaintiffs to rely upon ineffective and inadequate means of communication during the GPD's investigation and critical arrest and post-arrest proceedings; 3) forcing a companion to provide in-person translation services for Maria; and 4) failing to ensure facilities such as the Jail were equally accessible to Deaf individuals.

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

19

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

100.   The City's violation of its obligations and Plaintiffs' rights under the RA and its implementing regulations has caused substantial damages, suffering, loss, and harm to Plaintiffs, including, without limitation, serious and lasting emotional harm, anxiety, frustration, fear, and other serious emotional conditions or symptoms.

101.   29 U.S.C. § 794a(a)(2) provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."

102.   Accordingly, 29 U.S.C. § 794a(a)(2) provides that anyone bringing claims of discrimination against a recipient of federal funding may avail themselves of the remedies in 42 U.S.C. § 2000e-5(e)(3), which in turn states: "*In addition to* any relief authorized by section 1981a of this title … an aggrieved person may obtain [other] relief …." 42 U.S.C. § 2000e-5(e)(3)(B) (emphasis added). And 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

103.   On information and belief, the City, either directly or through its subdivisions, receives financial assistance from one or more federal agencies, and therefore qualifies as a program or activity pursuant to 29 U.S.C. §794(b) and is subject to the requirements of Section 504 of the RA.

104.   As such, "*any person* aggrieved by *any act or failure to act by any recipient of Federal Assistance . . . under section 794*" is entitled to the "*remedies*, procedures, and rights" not only in "title VI of the Civil Rights Act of 1964," but also in "subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5)." 29 U.S.C. § 794a(a)(2) (emphasis added).

105.   42 U.S.C. § 2000e-5(e)(3), in turn, authorizes certain relief "[i]n addition to any relief authorized by section 1981a," and 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

106.   Plaintiffs are also entitled to other forms of compensatory damages beyond emotional-distress damages because Defendants are subject to remedies traditionally available in suits for breach of contract. "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." Rest. (Second) of Contracts § 347 cmt. A (Am. L. Inst. 1981). Here, when citizens like Plaintiffs interact with public entities like Defendants, they expect that they will be able to communicate with the public officials throughout the interactions.

107.   Accordingly, Plaintiffs had an expectation interest in the ability to fully participate in their own criminal proceedings, such as investigation, arrest, booking, detainment, arraignment, release, court proceedings, and probation. Defendants denied Plaintiffs this expectation interest by denying them the opportunity to be informed about and participate in their criminal proceedings. Accordingly, Plaintiffs should be entitled to compensatory damages under their expectation interest.

108.   Plaintiffs are also entitled to damages for dignitary harm. *See Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008) (concluding that a "past injury" includes a defendant's "discriminatory failure to ensure effective communication"). "There is no doubt that dignitary harm is cognizable; stigmatic injury is 'one of the most serious consequences' of discrimination*." Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 833–34 (7th Cir. 2019) (quoting *Allen v. Wright*, 468 U.S. 737, 755 (1984)). "A plaintiff personally denied equal treatment by the challenged discriminatory conduct has suffered a concrete injury …." *Id.* at 834 (cleaned up). Thus, Plaintiff should be entitled to damages for dignitary harm. *See Shaver v. Indep. Stave Co.*, 350 F.3d 716, 724 (8th Cir. 2003) ("[T]he mere fact of discrimination offends the dignitary interest that [civil rights laws are] designed to protect, regardless of whether the discrimination worked any direct economic harm to the plaintiffs.").

109. Defendants discriminated against Plaintiffs on the basis of their disability by denying them meaningful access to the services, programs, and benefits provided by Defendants to other individuals, and by refusing to provide auxiliary aids and services necessary to ensure effective communication with Plaintiffs, in violation of Section 504 of the RA.

110. Defendants further discriminated against Plaintiffs by failing to ensure effective communication through the specific provision of a qualified, in-person interpreter.

111. The City, through the GPD, further discriminated against Plaintiffs by failing to train its officers to accommodate disabled individuals and failing to modify discriminatory practices and procedures, as required by the RA.

112. Defendants further discriminated against Mark by failing to ensure the Jail facilities were conducive to access by a Deaf individual, and by failing to secure an ASL interpreter for Ivanito's arraignment hearing.

113. Defendants' violations of Plaintiffs' rights under the RA caused them to suffer from discrimination, unequal treatment, and exclusion.

114. As set out above, absent injunctive relief there is a clear risk that Defendants' actions will recur with Plaintiffs and/or other Deaf individuals, and their companions.

115. Plaintiffs are entitled to injunctive relief, as well as compensatory damages for the injuries and loss sustained as a result of Defendants' discriminatory conduct, as well as an award of attorneys' fees, costs, and disbursements, pursuant to the RA. *See* 29 U.S.C. § 794.

## COUNT III

### *Monell* Claim under 42 U.S.C. § 1983

116. Plaintiffs reallege all other allegations in this Complaint.

117. Ivanito is entitled to relief against the City as a result of the actions or omissions of its agents, including the GPD, the Jail, and the Court, under 42 U.S.C. § 1983 pursuant to *Monell v. Dep't of Soc. Servs.*, 466 U.S. 658, 660-61 (1978).

118. A claimant may establish *Monell* liability by demonstrating, *inter alia*, a

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

22

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

municipal custom or practice that gave rise to the alleged violation, a municipality's failure to train its employees, or ratification of a subordinate's decisions. *See, e.g., Trevino v. Gates,* 99 F.3d 911, 918 (9th Cir. 1996) (custom or practice); *City of Canton*, 489 U.S. 378, 388-91 (1989) (failure to train); *Christie v Iopa*, 176 F.3d 1231, 1238 (9th Cir. 1999) (ratification).

119. GPD Officers, while acting under the color of state law, knowingly and intentionally violated Ivanito's constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution.

120. On information and belief, GPD's policy, custom, and practice purposefully avoids the use of ASL interpreters during arrests and post-arrest procedures, and amounts to violations of clearly established laws, including laws establishing the constitutionally-protected right to due process.

121. On information and belief, the Jail's and the Court's policy, custom, and practice purposefully avoids the use of ASL interpreters during critical interactions and court hearings, which amounts to violations of clearly-established laws, including laws establishing the constitutionally-protected right to due process.

122. Defendants' conduct evidences a reckless or callous indifference to Ivanito's constitutionally-protected rights.

123. Defendants knew or reasonably should have known that Ivanito is disabled, and that the disability manifested in an inability to hear or communicate without a qualified ASL interpreter.

124. Defendants knowingly violated Ivanito's well-established constitutional right to due process by depriving him of effective communication during critical arrest and post-arrest proceedings.

125. Defendants knowingly violated Ivanito's well-established constitutional right to equal protection under the law by discriminating against him on the basis of his disability.

126. Defendants knowingly violated Ivanito's well-established constitutional right to be free from an unreasonable search and seizure by arresting him without communicating with him as part of their investigation due to his disability.

127.   Defendants knowingly violated Ivanito's well-established constitutional right to participate in his criminal proceeding by failing to procure an ASL interpreter or equally effective communication aid for and during Ivanito's arraignment.

128.   The City failed either to develop and implement a policy pursuant to federal and state laws and regulations that were enacted to prevent discrimination against disabled individuals, or to train its agents and officers to adhere to anti-discrimination laws and regulations.

129.   To the extent an applicable policy exists, the City's failure to train its agents and officers to comply with that policy is compounded by its failure to supervise officers to ensure their adherence to the policy.

130.   The City's failure to train and supervise the Officers resulted in their repeated and deliberate conduct in disregarding the constitutional rights of Deaf individuals such as Ivanito by denying requests for a qualified ASL interpreter during arrest and post-arrest proceedings.

131.   The City's failure to train the GPD Officers in the importance of utilizing qualified ASL interpreters during interactions that implicate Deaf individuals' constitutionally-protected rights evidences the City's deliberate indifference to the fundamental rights of Deaf citizens to equal protection under the law and to due process.

132.   On information and belief, the City knew or should have known that denying effective communication to a suspect and arrestee, despite his known disability and specific requests for an interpreter, would deprive him of the right to effective communication and to due process.

133.   Ivanito is entitled to an award of punitive damages because Defendants' actionable acts and omissions, as alleged herein, were willful, malicious, intentional, recklessly indifferent, and/or undertaken with an evil mind and motive and with disregard for and deliberate indifference to Ivanito's legal rights under federal law and the substantial risk of serious and material harm to them.

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court grant the following relief:

A.      Enter judgment in Plaintiffs' favor after finding that Defendants' conduct, practices, policies, and procedures subjected them to discrimination in violation of Title II of the ADA and Section 504 of the RA.

B.      Enter judgment in Plaintiffs' favor after finding that Defendants violated Plaintiffs' well-established constitutional rights, in violation of 42 U.S.C. § 1983.

C.      Enter judgment in Plaintiffs' favor and require the City to institute a policy of nondiscrimination against Deaf individuals, and to train its officers to adhere to the policy.

D.      Award to Plaintiffs:

i.      All appropriate actual and compensatory damages pursuant to the ADA, Section 504 of the RA, and 42 U.S.C. § 1983;

ii.      To the extent allowed by any applicable law, award exemplary or punitive damages in an amount sufficient to punish Defendants for their wrongful conduct, and to deter similarly-situated persons or entities from engaging in comparable conduct in the future;

iii.      Reasonable costs and attorneys' fees pursuant to the ADA, Section 504 of the RA, and 42 U.S.C. § 1983;

iv.      Interest on all amounts at the highest rate and from the earliest date allowed by law; and

v.      Any other relief this Court finds just, necessary, and appropriate, including nominal damages.

////

////

////

////

////

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

## JURY DEMAND

Plaintiffs demand trial by jury for all of the issues a jury properly may decide, and for all of the requested relief a jury may award.

Dated this 27th day of February 2023.


RICHARDS & MOSKOWITZ PLC


*/s/ Natalya Ter-Grigoryan*
William A. Richards
Natalya Ter-Grigoryan
1850 N. Central Avenue, Suite 2010
Phoenix, AZ 85004

AND

EISENBERG & BAUM, LLP
Andrew Rozynski
24 Union Square East, Penthouse
New York, NY 10003

*Attorneys for Plaintiffs*